IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DONALD COLE,               )
                                  )
        Plaintiff,             )
                                    )
    v.                            ) Civ. Action No. 10-088-GMS
                                    )
COMMISSIONER CARL DANBERG,      )
et al.,                           )
                                    )
        Defendants.        )

### MEMORANDUM OPINION

The plaintiff Donald Cole ("Cole"), an inmate at the James T. Vaughn Correctional

Center ("VCC), Smyrna, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983 and the

Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a).

(D.I. 1.) He appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant to

28 U.S.C. § 1915. (D.I. 11.)

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

The case proceeds on the second amended complaint filed on March 14, 2012. (D.I. 47.)

The second amended complaint raises claims regarding Cole's right to practice his religion, as

follows: (1) Count 1, denial of the right to observe Islamic holidays;[1] (2) Count 2, denial of

religious fundraising; (3) Count 3, denial of the right to congregational prayers; and (4) Count 4,

---

[1]On June 6, 2014, the defendants were granted summary judgment on all 42 U.S.C.
§ 1983 claims that predate January 29, 2008 and all RLUIPA claims that predate January 29,
2006, as time-barred. The time-barred claims include all claims raised in Count 1, the denial of
the right to observe Islamic holidays. Notably, the record reflects that Muslim inmates at the
VCC celebrate religious holidays including Ramadan, Eid-ul-Fitr, and Eid al-Adha. (*See* D.I. 38,
ex. A; D.I. 68, ex. A at 19 and ex. B; D.I. 83, ex. C.)

religious discrimination. The defendants are sued only in their official capacities. The second amended complaint seeks declaratory and injunctive relief.[2]

The remaining defendants Carl Danberg ("Danberg"), Perry Phelps ("Phelps"), Frank Pennell ("Pennell"), and Ron Hosterman ("Hosterman") move for summary judgment (D.I. 80) on the grounds that: (1) the evidence does not contain any genuine issues as to whether Cole's rights were violated under either 42 U.S.C. § 1983 or RLUIPA; (2) Cole failed to establish discrimination with regard to the Muslim clerk claim; (3) Cole failed to provided a basis for the denial of access to a typewriter discrimination claim; (4) Cole failed to show that the policy concerning prayer or time for religious services places a substantial burden on the exercise of his religion; (5) the policy prohibiting institutional accounts and fundraising does not place a substantial burden on Cole's exercise of religion; and (6) Cole has failed to show that funds for religious groups are not distributed equally.[3] (D.I. 81.) Cole opposes the motion.[4] (D.I. 83.)

### B.    Factual Background

Cole has been a practicing Muslim since 1996. (D.I. 68, ex. A at 18.) He has a prayer rug and a Qur'an, but no longer owns a kufi having given it away. (*Id.* at 17.)

---

[2]On June 6, 2014, the court granted the defendants' motion for summary judgment on the 42 U.S.C. § 1983 and RLUIPA monetary claims raised against them in their official capacities. (D.I. 72.)

[3]While the defendants move for summary on this issue, it is nowhere to be seen in the second amended complaint and Cole did not mention the issue in his opposition to the motion for summary judgment. The court will not analyze the issue as Cole seeks no relief with regard to distribution of funds to religious groups.

[4]Cole indicates that he was unable to produce documents because he was denied access to the office that contained all his records, grievances, etc. (*See* D.I. 83 at 7, exs. A-C.)

On May 28, 2009, Phelps approved and/or authorized: (1) each faith practice to give to charities, offerings and/or tithes through their own giving; (2) bean pies for purchase through the commissary; and (3) Eid-ul-Fitr[5] and Eid al-Adha.[6] (D.I. 83, ex. C.) A request for an Eid feast was denied.[7] (D.I. 68, ex. A at 13.) On the same date, Phelps denied: (1) approval to sell items or pursue fundraisers; (2) approval to have Islamic oils and siwak;[8] and (3) the use of outside food or special Islamic inmates to prepare food. (*Id.*)

According to Pennell, bean pie fund-raising was discontinued because of an institutional violation that was subject to an investigation. (*Id.*) According to Hosterman, the policy was discontinued due to issues with fraud and theft associated with fundraising and institutional accounts for groups at the VCC. (D.I. 82.) There are no fundraising opportunities for any faith. (D.I. 68, ex. B.) Inmates may give to charities through their accounts at their discretion. (*Id.*)

A VCC policy does not allow inmates to congregate in the housing units for any purpose. (*Id.* at ex. B) According to Cole, congregational prayer benefits his religion because when praying together you receive "27 more times more blessings." (D.I. 68, ex. A at 14.) Inmates may gather for prayer on Fridays at Jummah and on Saturday at Taleem services. (*Id.* at ex. B.)

---

[5]An important religious holiday celebrated by Muslims that marks the end of Ramadan, the Islamic holy month of fasting. *See* https://en.wikipedia.org/wiki/Eid_al-Fitr (Aug. 6, 2015).

[6]The second of two religious holidays celebrated by Muslims each year. *See* https://en.wikipedia.org/wiki/Eid_al-Adha (Aug. 6, 2015).

[7]Eid means festival or holiday in Arabic, but without a full name most likely refers to Eid al-Fitr. *See* https://en.wikipedia.org/wiki/Eid (Aug. 12, 2015).

[8]A stick obtained from a plant that grows around Mecca and the Middle East area that is widely used among Muslims to clean their teeth. *See* http://www.missionislam.com/health/siwak.htm (Aug. 11, 2015).

Cole testified that he attends services on Fridays and Saturdays for a group gathering of prayer. (*Id.* at ex. A, 13-14.) A May 3, 2011 memo authored by Pennell that discusses the denial of a request for a congregational prayer schedule, states that the security, operational needs, facility management and movement at the VCC take priority. (D.I. 38, ex. A.) The memo points out the authorization of congregational prayer after breakfast and before evening meal during the month of Ramadan. (*Id.*) It also refers to weekly congregational prayer at Jummah and Taleem services. (*Id.*) In the memo, Pennell advises inmates that they may make up their prayers at the end of each day during the last prayer time or throughout the day as opportunity affords. (*Id.*) The memo concludes with "classes, studies, programs, etc. have been granted to all recognized faiths within security requirements and operational needs." (*Id.*)

Cole testified that the meat served is not Halal and this contradicts his religious beliefs. (*Id.* at 20.) Other things are served, such as fish on Fridays, vegetables and bread, but nothing that replaces the meats. (*Id.* at 19-21) Cole testified that the Qur'an does not state he should be a vegetarian, but for him to eat meats and fish; that is "everything under the sun except for swine." (*Id.*)

According to Pennell, inmates are offered a yearly seminar. The seminar is universal and may be attended by inmates of all faiths. (D.I. 68, ex. B.) Over the years, inmates of all faiths have attended and offered their input in the seminars. (*Id.*) In addition, the Muslim community has various classes, programs, and services that equal or exceed some other faiths. (*Id.*)

According to Hosterman, the VCC makes efforts to have all services start and end on time. (D.I. 82.) The timing of all services is subject to the operation and security conditions at

that time. (*Id.*) Because institutional conditions are not static, the schedule must be flexible to ensure the facility is safe and secure. (*Id.*)

Cole seeks the employment of a Muslim clerk. (*Id.* at ex. A at 22.) He testified that he uses clerk services that are located at the chapel, that clerks have assisted him, and that he has never had a problem receiving services. (*Id.* at ex. A at 22-23.) Cole does not know how the clerks are selected. (*Id.* at ex. A at 23.) According to Pennell, there has never been discrimination of Muslims for paid positions and, through the years, inmates of all faiths have worked as clerks. (*Id.* at ex. B.) Hosterman states that clerks are not chosen to serve inmates of their faith, but are chosen to work for the VCC and to perform duties as needed for the facility. (D.I. 82.) The clerks are hired for the entire inmate population. (D.I. 68, ex. B.)

Cole testified that he has not had access to a typewriter while at VCC, and he does not know if other inmates have access to a typewriter. (D.I. 68, ex. A at 23.) He wants the use of a typewriter for memos and for a proper letterhead. (*Id.*) Cole does not know if the Christian community has access to typewriters. (*Id.* at 24.) According to Hosterman, typewriters are reserved for employees and inmate workers. (D.I. 82.)

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the clams in question. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

5

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir. 1989). Pursuant to Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 247-249. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

## III. DISCUSSION

The First Amendment's protection of the right to exercise religious beliefs extends to all citizens, including inmates. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Cole raises free exercise of religion, RLUIPA, and religious discrimination claims. Cole's free exercise and equal protection claims required him to prove that the defendants' conduct was not "reasonably related to legitimate penological interests" under the four factor test set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000) (The *Turner* analysis is "equally applicable" to equal protection claims.).

When a prisoner claims that his right to exercise religion has been curtailed, a court must determine as a threshold matter whether the prisoner has alleged a belief that is "both sincerely held and religious in nature." *DeHart*, 227 F.3d at 51. If so, the court must then apply the four-factor test set forth in *Turner v. Safley*, to determine whether the curtailment at issue is "reasonably related to penological interests." *Id.* Four factors determine whether a prison regulation that infringes on an inmate's First Amendment rights is reasonable and, therefore, constitutionally valid. First, is there "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it [?]." *Turner*, 482 U.S. at 89. Second, are there "alternative means of exercising the right that remain open to prison inmates[?]" *Id.* at 90. Third, what "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[?]" *Id.* And fourth, do there exist "obvious, easy alternatives" suggesting that the regulation is "an 'exaggerated response' to prison concerns[?]" *Id.* The burden of persuasion in challenging the reasonableness of a prison regulation ultimately rests on the inmate, but the

7

prison has the "slight" burden of demonstrating the first *Turner* factor. *See Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012), *cert. denied*, __U.S.__, 133 S.Ct. 41 (2012).

Cole also raises claims under RLUIPA. *See* 42 U.S.C. § 2000cc-1. Under RLUIPA, "[a] plaintiff-inmate bears the burden to show that a prison institution's policy or official practice has substantially burdened the practice of that inmate's religion." *Washington v. Klem*, 497 F.3d 272, 278 (3d Cir. 2007). "A substantial burden exists where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Heleva v. Kramer*, 330 F. App'x 406, 409 (3d Cir. 2009) (unpublished) (quoting *Washington v. Klem*, 497 F.3d at 280).

If a litigant presents prima facie evidence that his free exercise rights were substantially burdened, the government must show that the burden is in furtherance of a compelling governmental interest and is "the least restrictive means of furthering that . . . interest." *Washington*, 497 F.3d at 277 (citing RLUIPA, 42 U.S.C. § 2000cc–1(a)). "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt v. Hobbs*, __U.S.__, 135 S.Ct. 853, 864 (2015) (internal quotation marks and alterations omitted).

The drafters of RLUIPA were mindful that discipline, order and security are urgent in penal institutions, and they therefore anticipated that courts would apply the RLUIPA test "with due deference to the experience and expertise of prison and jail administrators in establishing

necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *See Cutter v. Wilkinson,* 544 U.S. 709, 723 (2005). RLUIPA, however, does not permit unquestioning deference. *Holt,* 135 S.Ct. at 864. It is the obligation of the courts to consider whether exceptions are required under the test that requires the defendants not merely to explain why they took the actions they did, but to prove that their actions are the least restrictive means of furthering a compelling governmental interest. *See id.* As observed by the Supreme Court in *Holt,* "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." *Id.*

There are three religious exercises at issue: (1) religious fundraising; (2) congregational prayer; and (3) food that comports to the religious dictates of Islam.[9] The other issues speak to religious discrimination. Cole has been a practicing Muslim since 1996, and the defendants do not dispute the sincerity of his belief.

## A. Funds and Fundraising, Count II; Institutional Accounts, Count IV

In Count II, Cole alleges that he and the Islamic community have been deprived by Phelps of the ability to raise funds and, therefore, he cannot pay obligatory religious taxes, make obligatory charitable contributions, purchase Qu'rans, hadiths, books for classes, tapes, and videos, as needed. In addition, the Islamic community may no longer sell bean pies for fundraising. In Count IV, Cole alleges that, in June 2011, Pennell submitted a proposal to

---

[9]Cole refers to the religious diet issue as religious discrimination. Cole proceeds *pro se*, and therefore, his second amended complaint is liberally construed as also raising this claim under the First Amendment and RLUIPA.

9

Hosterman to allow the Islamic community to have an institutional account, similar to other organizations, but Hosterman denied the request.

The record reflects that on May 28, 2009, Phelps approved the religious practice giving to charities, offerings and/or tithes, individually and not as a community, and denied approval to sell items or pursue fundraisers. According to Pennell, bean pie fundraising was discontinued because of an institutional violation that was subject to an investigation. According to Hosterman, there were issues with fraud and theft associated with fundraising and institutional accounts for groups at the VCC and, therefore, the VCC discontinued the policy that allowed fundraising and institutional accounts for groups. There are no fund-raising opportunities for any faith. Inmates may give to charities through their accounts at their discretion.

Under past administrations, inmates were allowed to fundraise and maintain institutional accounts for their organizations, but fundraising was discontinued. Cole argues that it is a fundamental principal of Islam to give to charity. He contends that, in the past, Muslim inmates were allowed to keep a charity box on the tier for Muslims who were in need. Cole states that, because it is against prison policy to barter or lend, the bean fundraising program was a means for Muslims to purchase prayer rugs, Kufis, Qu'rans, and pay for the burial of indigent Muslims. In addition, he argues that discontinuing institutional accounts placed a substantial burden on his ability to exercise his religion because charity is a fundamental principle of Islam. The defendants argue that the policy prohibiting fundraising and institutional accounts is the same for any group, faith based or not, and affects all inmates equally. In addition, they contend that the policy has a valid, rational connection to the VCC's interest to ensure that no illegal or criminal

activity associated with fundraising and institutional accounts will take place, as it has in the past.

With regard to the *Turner* factors, the court finds that there is a valid and rational connection between the regulation that no longer allows fundraising or institutional accounts and the legitimate interest of preventing fraud and theft to justify the regulation. Inmates are provided an alternate means of charity by using their own means to give to charitable organizations. The prison does not allow fundraising or the holding of institutional accounts by any faith based group, thus the impact is the same for all, and the prison no longer has to monitor fundraising activities to ensure no illegal activity takes place. Finally, as discussed above, Cole is afforded the opportunity to exercise the charity tenant of his faith by using his own money for charitable purposes. Applying the *Turner* factors, the court finds that summary judgment is appropriate for the defendants as to the First Amendment claim of charitable fundraising, and to the extent alleged, the discrimination claim, as to the fundraising and/or institutional account issue.

As to RLUIPA, Cole must show that the ban on fundraising has substantially burdened his practice of religion. The record reflects that Cole was not been forced to abandon the precepts of his religion given that he may make charitable contributions with his own funds. Nor is fundraising otherwise generally available to other inmates, as no inmates are allowed to fund raise. Finally, the record does not support a finding that the defendants placed substantial pressure on Cole to substantially modify his behavior. Instead as discussed above, Cole continues to have available to him the option of using his own funds for charitable means. Thus, the court is unable to conclude that Cole has shown that a substantial burden was placed on the

11

exercise of his religious rights in this context under RLUIPA and, therefore, will grant the defendants' motion for summary judgment.

## C. Congregational Prayer, III

Cole alleges that Phelps implemented procedures to prevent him and other Muslims from offering congregational prayers in housing units. In 2010, the issue was appealed and denied by Phelps and a second proposal in 2011 was also denied by Phelps. In addition, in 2011, Phelps directed that Pennell submit a written request to allow five daily prayers at the chapel when a security officer is present, and that request was also denied.

There is a VCC policy that does not allow inmates to congregate in the housing units for any purpose. According to Cole, congregational prayer benefits his religion because with group prayer one receives "27 more times more blessings." The VCC allows inmates to gather for prayer on Fridays at Jummah and on Saturday at Taleem services, and Cole attends services on both days for a group gathering of prayer. In the denial to the request for five daily prayers in the chapel with the presence of a security officer, Pennell states that the security, operational needs, facility management, and movement at the VCC take priority. The memo points out that, during the month of Ramadan, congregational prayer is authorized after breakfast and before evening meal and that congregational prayer is allowed at the weekly Jummah and Taleem services. In the memo, Pennell advises that inmates may make up their prayers at the end of each day during the last prayer time or throughout the day as an opportunity affords itself.

Cole argues that there is not a policy that prohibits any assembly within the housing unit, noting that in June and July 2014 Muslims were ordered to offer congregational prayer in the housing units, and questioning why congregational prayer is allowed in the housing units then,

12

but not for other months. In addition, Cole takes exception to the defendants' position that congregational prayer in the housing unit could place inmates and personnel at greater risk noting that inmates gather on a daily basis with little to no incidents; for example, on the tier, in the chow hall, basketball court, volley ball court, or just hanging out in the yard. (*Id.*) Cole contends that praying together does not incite a riot and only lasts about ten minutes. (*Id.*)

The defendants argue that summary judgment is appropriate because the VCC policy prohibiting assembly within the housing units is a valid, rational connection to the legitimate government interest in maintaining safety and security within the housing units. The defendants further argue that Cole has not shown that the policy places a substantial burden upon Cole and that the VCC has a compelling reason for the policy.

Prayer in congregation is considered to have more social and spiritual benefit than praying by oneself. *See* http://www.whyislam.org/submission/five-pillars-of-islam-2/prayer/ mosques-and-congregational-prayer-2/ (Aug. 13, 2015). Muslims observe five formal prayers each day. *See* http://islam.about.com/cs/prayer/a/prayer_times.htm (Aug. 13, 2015). According to most Islamic scholars, performing prayers in congregation is recommended for men, when they are able. *See* https://en.wikipedia.org/wiki/Salat (Aug. 13, 2015). The number of obligatory daily prayers varies according to the time of day or other circumstances. *See id.* Friday is the holy day of the week for Muslims and it is mandatory for men to offer pray in congregation. *See* http://www.whyislam.org/submission/five-pillars-of-islam-2/prayer/mosques-and-congregational -prayer-2/ (Aug. 13, 2015).

The "opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience and, therefore, a fundamental exercise of religion by a bona fide

13

religious group." *Sharp*, 669 F.3d at 160. Based upon the record currently before the court, genuine issues of material fact exist as to whether the policy at the VCC with respect to congregational prayer burdens Cole's right to freely exercise his religion. There is evidence in the record that daily communal prayer is an essential element of Plaintiff's religious beliefs, and that despite requests for supervised congregational prayer, the requests were denied. The defendants do not address why the requested supervised congregational prayer was denied, but only address that inmates are not allowed to congregate in the housing unit for security reasons. This despite, the assertion by Cole that congregational prayer was allowed in June/July 2014 and inmates congregate throughout the prison on a daily basis. With this factual dispute, the court cannot determine on a motion for summary judgment whether Cole's First Amendment rights have been burdened.

As to RLUIPA, the restrictions that do not allow congregational prayer on a daily basis may still be justified if the defendants can show that these restrictions are the least restrictive means of achieving a compelling government interest. The defendants state that the restriction prohibiting assembly in the housing unit is designed to maintain the safety and security of the housing unit. The defendants do not address the issue of allowing supervised daily prayer other than to state that daily prayer five times daily would compromise the ability for the VCC to run efficiently. The security and orderly operations of prisons is unquestionably a compelling government interest, *see, e.g., Cutter*, 544 U.S. at 725 n.13, and the defendants have a compelling interest in maintaining security over inmates. Yet the defendants offer no evidence that the restriction that prohibits assembly in housing units is the least restrictive means available to further that interest or why they have considered and rejected any other alternative means. The

14

burden lies with the defendants to show that the policy enforced was the least restrictive means available, and they have offered no evidence whatsoever to satisfy this burden. *See Holt*, 135 S.Ct. at 863. *Washington*, 497 F.3d at 284 ("[T]he phrase 'least restrictive means' . . . . necessarily implies a comparison with other means. Because this burden is placed on the Government, it must be the party to make this comparison."). Inasmuch as there remains a genuine issue of material fact, the court will deny summary judgment as to this claim.

### D. Religious Diet, Count IV

Count IV contains several claims. Therein, Cole alleges that the Jewish community is provided a Kosher diet which includes Kosher meat, but Phelps refuses to prove Muslims a Halal[10] diet. The matter was appealed to Danberg, but no action was taken, and later the request was denied. The matter was forwarded to Phelps who also denied the request.

Cole testified that the meat served is not Halal and this contradicts his religious beliefs. He also testified that the Qur'an does not state he should be a vegetarian, but for him to eat meats and fish; that is "everything under the sun except for swine." The record reflects that the VCC provides fish entrees on Fridays, as well as vegetarian options. Cole testified that vegetarian and fish options do not conflict with his religious beliefs, but he would like have access to Halal meat.

Cole argues that the VCC only serves fish on Friday, Kosher meals are served only to Jewish inmates, religious vegetarians are "everybody else, even those who don't claim any religion," and meals with dietary restrictions are selected through medical. (D.I. 83 at 7.) Cole

---

[10]Halal is Arabic for permissible and Halal food is that which adheres to Islamic law, as defined in the Koran. *See* http://www.bbc.com/news/uk-27324224 (Aug. 1, 2015).

15

further argues that the meat served at the VCC is Haram[11] and therefore conflicts with Islamic dietary restrictions. (D.I. 83 at 7.) The defendants seek summary judgment on this issue on the grounds that Cole has not established evidence to demonstrate violations of his constitutional rights or RLUIPA.[12] They argue that, as an alternative to offering Halal entrees, the VCC offers meals that do not conflict with Islamic dietary restrictions.

Cole's claim focuses on the Jewish inmates whose dietary restrictions the defendants accommodate while Muslim dietary restrictions are not. As discussed, there is no dispute over Cole's sincerity and the religious nature of his dietary request establishes that he has a constitutionally protected interest. Absent a compelling interest, the state cannot not favor others and disfavor Cole, in the context of society at large, based on the character of his religious beliefs. *See Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998) (holding that a classification that draws upon suspect distinctions, such as religion, "is subject to strict scrutiny and will pass constitutional muster only if it is narrowly tailored to serve a compelling state interest"). Cole, however, cannot obtain relief if the difference between the defendants' treatment of him and their treatment of Jewish inmates is "reasonably related to legitimate penological interests." *See Clark v. Groose*, 36 F.3d 770, 773 (8th Cir. 1994) (holding that in order for an inmate to recover on an equal protection claim, the inmate "must prove that the

---

[11]Meat that is not slaughtered in the Islamic manner. *See* http://www.muslimconverts .com/food/ (Aug. 13, 2015).

[12]In the defendants' statement of facts they state that, "The JTVCC provides a standard meal that never contains pork, a Kosher meal, vegetarian meal, and meal for those with dietary restrictions. (*Id.* at 19, ex. D). The Kosher meals are provided to any inmate who requests a Kosher diet (ex D.). The JTVCC meal options always include meals that are not Haram *i.e.* prohibited by the Islamic faith (*Id.*)." (D.I. 81 at 7.) The court thoroughly reviewed the record and it did not contain this evidence. Therefore, it is not considered by the court.

16

distinction between himself and the other inmates was not reasonably related to some legitimate penological purpose.").

Other than argument, there is no evidence of record that offering Halal entrees would affect the budget, security, and staffing at the VCC. Given the paucity of evidence, the defendants failed to demonstrate a legitimate government objective underlying their decision not to serve a Halal diet. *See e.g., Riley v. DeCarlo*, 532 F. App'x 23, 28 (3d Cir. 2013) (unpublished). Accordingly, the court will deny the motion for summary judgment on the issue of whether the defendants violated Cole's constitutional rights as to the religious diet issue.

As to RLUIPA, the restrictions imposed in not serving Cole a Halal diet may still be justified if the defendants can show that these restrictions are the least restrictive means of achieving a compelling government interest. This, they have filed to do. RLUIPA requires the prison "not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest." The burden lies with the defendants to show that the policy enforced here was the least restrictive means available, and they have offered no evidence whatsoever to satisfy this burden. Inasmuch as there remains a genuine issue of material fact, the court will deny summary judgment as to this claim.

### E.    Religious Discrimination, Count IV

Finally, the court considers Cole's remaining claims in Count IV that allege disparate treatment based upon his religious beliefs. As previously noted, the *Turner* analysis is "equally

17

applicable" to equal protection claims.[13]  *See DeHart*, 227 F.3d at 61, *supra*.

### 1.  Allotted Time for Worship/Services

The second amended complaint alleges that the Islamic community is discriminated against because its members are prevented from attending Friday services at the proper time and are not given equal time to conduct services similar to that given to other religious communities. Muslims are given 45 minutes while Christians are given two or more hours every Sunday. Cole alleges that Hosterman is aware of the practice, has the authority to stop it, but refuses. He also alleges that Pennell and Hosterman allow the Christian community to conduct all day, two-week seminars, twice a year from 9 AM to 2:45 PM, uninterrupted, and that the Islamic community requested the same allowances during the month of Ramadan, but were only allowed to assemble from 9 AM to 11 AM before they were required to return to their respective housing units.

The record reflects that inmates may gather for prayer on Fridays at Jummah and on Saturday at Taleem services. Cole testified that he attends services on Fridays and Saturdays for a group gathering of prayer. According to Hosterman, the VCC makes efforts to have all services start and end on time. The timing of all services is subject to the operation and security conditions at that time. Because institutional conditions are not static, the schedule must be flexible to ensure the facility is safe and secure.

The record further reflects that inmates are offered a yearly seminar that is universal and may be attended by inmates of all faiths. Over the years, inmates of all faiths have attended and provided their input at the seminars. In addition, the Muslim community has various classes,

---

[13]The Equal Protection Clause of the Fourteenth Amendment exists to protect similarly situated individuals from disparate treatment under the law or by some other state action.  *Artway v. Attorney Gen. of New Jersey*, 81 F.3d 1235, 1267 (3d Cir. 1996).

programs, and services that equal or exceed other faiths. Finally, classes, studies, and programs are granted to all recognized faiths within security requirements and operational needs.

Cole concedes that the times for services are subject to day-to-day activities. However, he argues that the yard is called at 1:00 PM but, at times, the Muslim community must wait until 1:45 PM for the call for Jummah. He further argues that, even when things run normally, Muslims must wait for the call to chapel.[14]

The defendants contend that summary judgment is appropriate as to this issue. They argue that the VCC cannot be held to a rigid schedule when there are daily emergencies and unforseen circumstances that may required a schedule modification. The defendants further argue that Muslims are permitted to gather on Friday and Saturdays that, when combined, equal one Sunday service, and Cole has not shown that Christians are given more time for worship or enrichment. They finally argue that, as a Muslim, Cole has the opportunity to attend classes, programs, and services that equal or exceed some faiths.

The VCC makes every effort to have all services start and end on time, subject to operation and security conditions. Since institutional conditions are not static, the schedule must be flexible to ensure the facility is safe and secure. Moreover, time is allotted to Muslims for Friday and Saturday services and, while Cole complains that Christians are given more time to worship on Sunday, he fails to consider the cumulative time afforded to Muslims for Friday and

---

[14]In his opposition, Cole contends for the first time that Saturday Taleem services are routinely canceled. He asserts that though an outside Imam has been hired, he cannot be in multiple places at the same time. Accordingly to Cole, he is "lucky" if Taleem services are held every other month. The court will not consider the issue given that it has not been previously raised.

Saturday services. The annual seminar of which Cole complains is open to inmates of all religions. Finally, the record does not reflect that Muslim inmates are treated differently from inmates of other religious affiliations with regard to the time allotted for worship. While Cole complains that services do not always start on time, the court does not consider a delay in service as imposing a burden on Cole in exercising his religion. Cole's constitutional rights in this regard have not been violated, and no reasonable jury could find for him on this claim. Therefore, the court will grant the defendants' motion for summary judgment as to the time allotted to Muslims for worship.[15]

### 2. Inmate Clerk

The second amended complaint alleges discrimination because Protestant and Catholic communities have an inmate who serves and/or works at the prison chapel as a paid clerk, but Pennell and Hosterman will not allow the Islamic community to have a clerk.

Cole seeks the employment of a Muslim clerk. He testified that he uses clerk services that are located at the chapel, that clerks have assisted him, and that he has never had a problem receiving services. According to Pennell, there has never been discrimination of Muslims for paid positions and, through the years, inmates of all faiths have been hired as clerks. Hosterman states that clerks are not chosen to serve inmates of a particular faith, but are chosen to work for the VCC and perform duties as needed for the facility.

Cole argues that the VCC does not have a policy of hiring the best applicant for clerk positions. The defendants argue that Cole failed to identify any prison regulation with regard to

---

[15]To the extent that Cole raises this claim under RLUIPA, there is no evidence of record that the allotted time for worship or services substantially burdened his exercise of religion.

the hiring of inmate clerks.

The record does not reflect that Muslim inmates are treated differently from inmates of other religious affiliations when hired for inmate clerk positions. Nor does the record reflect that Cole was burdened in any manner in exercising his religion with regard to the hiring of inmate clerks. Clerks have assisted him and he has never had a problem receiving services. In addition, the record reflects that through the years inmate clerks of all religious affiliations have been hired. Finally, the record reflects that inmate clerks are not chosen because of their religious affiliation. Cole's constitutional rights in this regard have not been violated and no reasonable jury could find for him on this claim. Therefore, the court will grant the defendants' motion for summary judgment as to the hiring of inmate clerks claim.[16]

### 3. Typewriters

The second amended complaint alleges that Pennell provides a typewriter to Protestant and Catholic communities but refuses to provide a typewriter to the Islamic community. The record reflects that Cole never had access to a typewriter while at VCC, and raised the issue because he was unaware if other inmates or the Christian community had access to typewriters. According to Hosterman, typewriters are reserved for employees and inmate workers.

Cole does not address the issue in his opposition to the motion for summary judgment. The defendants move for summary judgment on the grounds that Cole did not substantiate his claim that the Protestant and Catholic communities have access to a typewriter.

---

[16]To the extent that Cole raises this claim under RLUIPA, there is no evidence of record that the manner used to hire inmate clerks substantially burdened his exercise of religion.

The record does not reflect that Muslim inmates are treated differently from inmates of other religious affiliations in the use of typewriters. Indeed, Cole testified that he was unaware if religious communities other than Muslims had access to typewriters. Notably, the use of typewriters is limited to employees and inmate workers. Finally, although Cole testified that he has no typewriter access, the record does not reflect that this burdened him in any manner in exercising his religion. Cole's constitutional rights in this regard have not been violated, and no reasonable jury could find for him on this claim. Therefore, the court will grant the defendants' motion for summary judgment as to use of typewriters.[17]

IV.    **CONCLUSION**

For the above stated reasons, the court will grant in part and deny in part the defendants' motion for summary judgment. (D.I. 80.) The defendants' motion for summary judgment will be: (1) granted as to Count II against Phelps; and the Count IV denial of institutional accounts, allotment of time for worship, the hiring of clerks, and typewriter claims against Hosterman, Pennell; and (2) denied as to Count III against Phelps and Pennell, and the Count IV religious diet claim against Phelps and Danberg. In addition, the court finds it appropriate to encourage legal representation for Cole by an attorney in this case.

An appropriate order will be entered.

UNITED STATES DISTRICT JUDGE

Sept 14, 2015
Wilmington, Delaware

---

[17]To the extent that Cole raises this claim under RLUIPA, there is no evidence of record that the lack of the use of a typewriter substantially burdened his exercise of religion.